CYRIL C. TYLER, AND HIS WIFE, SARAH P. TYLER, APPELLANTS, *v.* GEORGE N. BLACK.

Where a person desired to purchase land from a party who was ignorant that he had any title to it, or where the land was situated; and the purchaser made fraudulent

representations as to the quantity and quality of the land, and also, as to a lien which he professed to have for taxes which he had paid; and finally bought the land for a grossly inadequate price, the sale will be set aside.

THIS was an appeal from the Circuit Court of the United States for the District of Maine, sitting as a court of equity.

The facts are all stated in the opinion of the court.

It was argued by *Mr. Fessenden,* for the appellants, and *Mr. Rowe,* for the appellee.

The points made by the counsel for the appellants were the following, viz.:

The complainants claim to have their deed to Black, dated November 30, 1846, cancelled, and a reconveyance of said estate, on the following grounds.

1. For fraud and fraudulent representations.

2. For inadequacy of price, as, of itself, furnishing evidence of fraud.

3. For the two preceding grounds united.

*General Considerations.* The acts and declarations of Black, to show he had formed a design to commit frauds in making this purchase, as opportunity should offer.

All such acts and declarations of Black made to other persons, about the time of the transaction, are competent evidence for complainants, for that purpose. Bradley *v.* Chase, 22 Maine Rep. 511; Warner *v.* Daniels, 1 Woodb. & Minot, R. 90; Wood *v.* The United States, 16 Pet. R. 342; s. c. 14 Pet. R. 430.

Complainants rely on the testimony of the Vermont witnesses, viz.: Edward F. Putnam, Albert G. Soule, E. P. Soule, and Phebe Hendricks, to prove such acts and declarations of Black.

*First Proposition.* The bill, answer, and evidence, establish complainants' proposition of fraud, on the part of Black, in several particulars, either of which is sufficient to entitle them to a decree in their favor.

1. As to complainants' title and the evidence of it, and Black's misrepresentations concerning it.

2. Black's misrepresentations as to the number of acres.

3. Black's misrepresentations as to incumbrances on the land, and particularly of his lien thereon for taxes, alleged to have been paid by himself.

4. Black's misrepresentations of the value of the land.

(Each one of these points was examined according to the evidence.)

*Second Proposition.* The doctrine is well stated in Story's Commentaries on Equity Jur. §§ 245 and 246. After stating the general proposition that mere inadequacy is not a sufficient ground for relief, he says, (sect. 246,) " Still, however, there may

be such unconscionableness, or inadequacy in a bargain, as to demonstrate some gross imposition, or undue influence; and in such cases, courts of equity ought to interfere upon the satisfactory ground of fraud. But then, such unconscionableness, or such inadequacy, should be made out as would, to use an expressive phrase, shock the conscience, and amount, in itself, to conclusive and decisive evidence of fraud. And where there are other ingredients in the case of a suspicious nature, or peculiar relation between the parties, gross inadequacy of price must necessarily furnish the most vehement presumption of fraud."

The same doctrine is stated in Fonb. Eq. B. 1, c. 2, sect. 9, note *e*.

" Where the deed is executed, if the parties have not been on equal footing, or, if there has been any concealment, or misrepresentation, or imposition, courts of equity uniformly set aside such deed or contract." Sug. Vend. 6th Amer. ed. p. 317, and note 2.

" Where the circumstances of the case are such as have afforded an opportunity, either from the situation or condition of the parties, or the nature of the property, for either of them to take a fraudulent advantage of the other, and the consideration is grossly inadequate, this court considers that circumstance to be evidence of fraud, and will not only refuse a specific performance at the instance of the former, but will, at the suit of the latter, rescind the transaction." Jer. Eq. Jurisd. 483, and notes.

" A conveyance, obtained for an inadequate consideration, from one not conusant of his right, by a person who has notice of such right, will be set aside, although no actual fraud or imposition be used." Sug. Vend. 6th Amer. ed. 320.

" Although it may be impossible, by any general proposition, to define what is to be understood by gross inadequacy of consideration, as it must, in a great measure, depend upon the circumstances of each individual case in which the question may arise, yet, if it be so gross and palpable, as of itself to afford evidence of actual fraud, the court will set aside a sale." Jer. Eq. Jur. 433, (note 7); Osgood *v.* Franklin, 2 Johns. Ch. 1, and cases cited.

In Turner *v.* Harvey, 1 Jacob's Ch. R. 169, which was a case where the vendors were ignorant of a fact or circumstance considerably increasing the value, the court say: " If a word, a single word be dropped which tends to mislead the vendor, the principle that the purchaser is not bound to give the vendor information as to the value of the property, will not be allowed to operate."

Again, in Hill on Trustees, 152, it is said, " Mere inadequacy, of itself, is not enough to set aside a contract; but where the inadequacy is so gross that it is impossible to state it to a ma

of common sense, without producing an exclamation as to the inequality of it, the court will infer, from that fact alone, that there must have been such imposition, or oppression in the trans- action, as to amount to a case of fraud, from which it would not suffer any benefit or advantage to be derived. Other circum- stances of fraud will aid the court."

To apply these principles to the case at bar.

The inadequacy of price, in this case, is such, as of itself, to afford evidence of fraud. In 1799 Parsons conveyed to Putnam for 50 cents an acre. Black paid Tyler and wife 8½ cents an acre.

Black, in his answer, says that it was worth from 50 cents to $2 per acre, November 30, 1846. Now 50 cents to $2 averages $1.25 per acre; so that Black purchased for 8½ cents an acre what he admits was worth $1.25 an acre. He bought for $50 what he admits was worth $757.50.

*Third Proposition.* The bill may be sustained on the ground of fraud and fraudulent representation, and for inadequacy of price, united.

On these principles the court will find a rule for their guid- ance in Seymour *v.* Delancey, 6 Johns. Ch. R. 222. Chancellor Kent, in that case, found it convenient to take the average value, as established by the witnesses on the one side and the other.

On this principle the land was worth about $4.45 an acre, or $2,688.36, in November, 1846, date of deed of Tyler and wife o Black.

The denials of the answer are thus overcome, and the bill is maintained.

The counsel for the defendant in error made the following points, viz.:

The court has no jurisdiction. The value of the matter in controversy is one of the points at issue in the case. The proofs fail to show the land to be worth $2,000. It is not worth over 50 cents per acre, as shown by respondent's witnesses.

(The arguments upon this point upon both sides depend so entirely upon references to the testimony, that they cannot be reported.)

*Point* 2. There was no inadequacy of price.

The inadequacy, to be evidence of fraud, must be so gross as to shock the conscience. 1 Story's Eq. Jur. §§ 244, 245, 246; 1 Sugd. Vend. [*422, 423,] 318, 319, and cases there cited. Here is no satisfactory proof of such inadequacy as would even amount to damage. 1 Story's Eq. Jur. § 203. The considera- tion, on Black's part, was the $100 paid, the amount due for taxes and interest, and his claim for trouble and expenses, in dis-

20*

covering and notifying the heirs.    There is no sufficient proof now (as before shown) that all which Black takes by his deed is worth more than that.    At the time of the contract it was doubtful how much he would take by his deed, or whether he would take any thing..

It was not then fully ascertained whether Dr. Putnam died seized of any portion of this lot; and it was not known of how much, if any.    It was not even known that Parsons had sold him any land, or if any, how much.    The extent of Mrs. Tyler's rights, as heir at law, was not clearly ascertained.    The value of the land was unknown.    Defendant had no information but that derived from Mrs. Sheldon, and Tilden, and from the Putnams.

Where neither of the parties knows the value of the estate, no inadequacy of consideration can operate, even to prevent a decree for specific performance in favor of the purchaser.    Anon. cited in 1 Bro. C. C. 158, and 6 Ves. Jr. 24; 1 Sugd. Vend. [*441, 442,] 318.

*Point* 3.    There was no fraudulent concealment.

A purchaser is under no obligation to give any information, unless there be some relation of confidence between the parties. 2 Kent's Com. (5th ed.) 490.    By Lord Thurlow, in Fox *v,* Macreth, 2 Bro. C. C. 420; Laidlaw *v.* Organ, 2 Wheat. 178; 1 Story's Eq. Jur. sect. 207.

The parties to this contract were strangers to each other.    The complainants are persons of intelligence, and in " comfortable circumstances."

Black offered to communicate every thing for a reasonable compensation; and the offer was made at the commencement of the conversation, and repeated afterwards.    In fact there was no concealment.

Before the execution of the deed the complainants were informed of every fact, known to the defendant, in relation to the land and their title thereto.

It is too late for complainants to take advantage of any concealment during the negotiation, they having executed the deed after all the facts were fully disclosed.    Hovenden on Frauds, 106, cites Fleetwood *v.* Green, 15 Ves. 594; Burroughs *v.* Oakley, 3 Swanst. 168; 1 Sugd. Vend. 392, sects. 27, 28, and cases cited; 1 Story's Eq. Jur. sect. 203, a.

*Point* 4.    There was no misrepresentation.

The testimony of E. F. Putnam and others, as to the representations made to them at Fairfield, is irrelevant and inadmissible.    The interrogatories, which called it out, were objected to. If admissible, it is discredited by the evident bias and strong feeling of the witnesses; by their mutual contradictions, in rela-

tion to Black's denial of knowledge of the quantity of land, and his statements in relation to the number of acres, the price of land sold, the place searched for papers, &c.; and by their statement that Black said Mrs. Tyler was dead, which contradicts the case as settled by bill and answer.

Black did not represent that he had a tax-title, or a lien on the land. The charge is inconsistent in its several parts, and with complainants' proof. The claim, which he set up, was the claim which the answer shows that he had, an equitable one on the owners of the land, and not a legal charge on the land itself. He made no representation as to the number of acres.

This charge is not made the subject of a particular interrogatory, but is covered by interrogatories 7 and 16; and is denied in the answer.

Black stated that he "did not know how many acres belonged to said Aaron Putnam;" he could not have known. The statement of the number of acres, if made, was a mere matter of opinion, so understood by all parties, and there is no evidence that it was insincere.

A misrepresentation must be of something more than a mere matter of opinion. 1 Story's Eq. Jur. 179; Hepburn *v.* Dunlop, 1 Wheat. 179.

The representation, if made, was not material. The land in itself is worthless; the only value is the timber. The number of acres gives no idea of the quantity of that. About the timber there were no representations made and no inquiries. It was no inducement to the sale. The bill contains no averment that it was an inducement; (see p. 627); no denial of its truth; no interrogatory in relation to it; no averment that the complainants believed it. It was not regarded as evidence of the value of the land sold by either party, for Tyler afterwards inquired again as to the character and value, and Black declared he knew nothing about it. The only inducement specifically charged is the doubt as to Mrs. Tyler's title. The only unfairness in relation to the value of the land charged against Black is the withholding information. He said that Tilden's part of the lot was purchased at a shilling per acre, and not at twelve and a half cents, as charged. Tilden paid a shilling. Black so stated at Fairfield; the Soules interpolated the word "York;" Stanwood borrows the story and reduces the York shilling to Federal currency.

500 acres at $12\frac{1}{2}$ cents, = $62.50, incumbered by tax claims for about $300. The story is incredible, and inconsistent with the propositions made by Black. What Black did say was not thus incredible or inconsistent, for Stanwood believed him, and

thought a doubtful title to half the land worth more than he asked for his information.

Black's representations of his inducements to purchase are not shown to be false; and, if they were, that would furnish no grounds for rescinding the contract.

A purchaser is under no legal obligation to make a true disclosure of his motives. Vernon v. Keys, 12 East, 632, 637, 638.

*Point 5.* The misrepresentation must be of something, in regard to which the party places known trust and confidence in the other. If the party had no right to place reliance upon it, and it was his own folly to give credence to it, it will not avoid the contract. 1 Story's Eq. Jur. sects. 197, 199.

Before any of the representations complained of were made, Black assured Dr. Tyler that he would give no information whatever, unless paid therefor; and repeatedly made the same assurance to him, in substance, in reply to his pressing questions. If, after that, Dr. Tyler relied upon any thing, wrung from the defendant by his importunate inquiries, it was a folly, from the consequences of which a court of equity will not relieve him.

*Point 6.* Before they executed the deed, the complainants knew where the land is situated, and where the evidence of their title is recorded, and could have ascertained whether the representations made by Black were true.

If Black made all the representations charged in the bill, they then knew that some of them were untrue, and were put on their guard as to the rest.

Misrepresentation of a matter, where a party was capable of seeing whether it was right or not, is no ground for relief. Ainslie v. Medlycot, 9 Ves. 13; 1 Madd. Ch. 253; Bayley v. Merrel, Cro. Jac. 386; 3 Bulstr. 95; 1 Story's Eq. Jur. sect. 149; 2 Kent's Com. 485, 486, note *d.*

The deceit must be such as ordinary prudence would not protect the party against. 1 Story's Eq. Jur. sect. 200, a.

*Point 7.* Black's claim on account of taxes paid, &c., is valid *in foro conscientiæ.* Complainants will not be entitled in equity to the relief prayed for, until provision is made for that claim.

They have never offered to pay him if he would rescind the contract; nor even requested him to rescind. The bill contains no such offer. The parties cannot be placed *in statu quo.*

Mr. Justice WAYNE delivered the opinion of the court.

This is an appeal from the Circuit Court of the United States for the District of Maine, sitting as a court of equity.

The complainants, Tyler and wife, filed their bill to set aside a sale of land made by them to Black, upon the ground of fraud, concealment, and fraudulent representations made to them by

Tyler et ux. v. Black.

Black; and also upon the ground of inadequacy of price as furnishing evidence of fraud.

Towards the latter end of the last century, the State of Massachusetts established a lottery for the sale of some lands in Maine; and one Zenos Parsons drew a prize of 1920 acres, being lot number one in township No. 33.

On the 25th of March, 1799, Parsons conveyed to Aaron Putnam, of Charlestown, Massachusetts, for the consideration of six hundred dollars, twelve hundred and twelve acres of the said land, being an undivided interest. Putnam had three children, two sons, and a daughter. The daughter married Tyler, and they were the complainants and appellants in the present cause. One of the sons died without issue, and the other son left two children, viz., Edward and Elizabeth, who married Soule, who resided in Fairfield, Vermont.

At the time of the death of Aaron Putnam, his daughter was a minor, and resided in Massachusetts. When the transaction occurred which gave rise to the present suit, she was residing with her husband, Tyler, at Hopkinton, in New Hampshire. Black resided near the land in Maine, and had acted as the agent of the owner of the remaining undivided interest for upwards of twenty years.

In November, 1846, Black went to Fairfield, in Vermont, and offered to purchase the share of Edward and Elizabeth, who were ignorant of their title to the land; but they refused to sell. Black there learned that Tyler and his wife were the owners of one half of the 1212 acres which had been conveyed by Parsons to Putnam, and immediately proceeded to Hopkinton to see them. At this time Black's position was this: he resided at the town of Ellsworth, which communicated, by a navigable stream, with the land in question; he had been connected, since 1833, with his father, John Black, in the business of agency for the proprietors of nearly all the lots in the townships in which the land in question was situated; and in the seasons of 1844 – 5 and 1845 – 6 there had been lumbering operations upon lands in the neighborhood.

The interview between Black and Tyler is thus described by Joseph Stanwood in his deposition.

Second. To the second interrogatory he saith:—"I was present at the public house when Mr. Black came here and took the deed, as before stated; my father-in-law and I were then keeping a public house; Mr. Black came in and inquired for Doctor Tyler; what sort of a man was he, and what were his circumstances as to property; I told him he was a physician, doing a tolerable good share of business; had his house and other buildings clear of debt, as I supposed."

.Third. To the third interrogatory he saith: — " I was not present at the commencement of the interview betwixt Tyler and Black; I left the room soon after Tyler came in; after they had been together perhaps an hour, Tyler came out and told, in substance, that Black and he had been talking about some land in Maine; I went into the room with them; Black said there was a tract of land in Maine, and he could find no person that had any claim to it, unless it belonged to the heirs of Doctor Putnam; Black said he would give Tyler fifty dollars for a deed of the land from Tyler and his wife; or, if they would give him fifty dollars, he would tell them all he knew about the land; they came to no agreement at that time, but separated late at night; the next morning Black said he had concluded to make Tyler another offer for the land; he would give him one hundred dollars for a deed; I went to Doctor Tyler, told what Black had offered, and he came in and concluded to take it.

Fourth. To the fourth interrogatory he saith: — " The inquiries in the first part of this interrogatory were not made, if made at all, in my presence, but I inferred from their conversation that these questions had been settled before I came into the room; Black represented that the land was situated in a township, and gave the number of the township, but refused to name the county; when the deed was made, he directed me to insert a different number from that he had represented in the previous conversation; he either represented that the township in which the land was situated was thirty-one, and directed me to insert thirty-three in the deed, or represented thirty-three as the number of the township, and had thirty-one inserted in the deed, but which I cannot now recollect.

Fifth. To the fifth interrogatory he saith: — " That Black said the land was holden, if held at all, by virtue of a lottery ticket, the form of which he attempted to describe; it was made of pasteboard or thick paper, as I understood; he said he had lately seen one in the hands of a Mr. Webster, I think, but I am not certain about the name; Black said he had made many inquiries about the title to this land; he had been to Springfield, Mass., and other places, for this purpose, but could find no record of the title any where; and he did not suppose there was any deed of this land on record, but that the whole claim to it depended upon the lottery ticket, and that alone.

Sixth. To the sixth interrogatory he saith: — " When Tyler inquired how many acres Doctor Putnam owned, Black answered, about five hundred."

Seventh. To the seventh interrogatory he saith: — " Black said he had a claim on this land for the taxes he had paid on

it; he said he had paid taxes on this land twenty-eight or twenty-nine years; think he said twenty-nine years; the amount I do not recollect, if he stated it; he said Tyler must pay him the amount of these taxes, and twenty-five per cent. interest, at all events, before he could avail himself of any title to this land, and this he required in addition to the fifty dollars mentioned in my answer to the third interrogatory; he said he would have the land sold for taxes, and get a good title."

Eighth. To the eighth interrogatory he saith: — " I do not recollect that Black represented what was the value of this particular piece of land, but he said a part of the same tract had been sold for twelve and a half cents per acre, and was still undivided; so that if Tyler should ever be able to find and get possession of the land, he would find himself an owner in common with others, and it would become necessary for him to get a division before he could do any thing with the land; he said a road had been, or would be, laid out through this township, which would much increase the taxes; he assigned as a reason why he wished to purchase the land, that another person had appeared and claimed a large part of it, and he thought it was best for him to be looking out for the remainder; and he had traced it back to Doctor Putnam, and had not found that he had parted with his title; till this claim was made to a part of the land, he had supposed he was in quiet possession, and that the claimants were all dead.

Ninth. To the ninth interrogatory he saith: — " Black's first offer was fifty dollars, and he did not vary from this till the morning, when he offered one hundred dollars; whether he professed to be liberal or not I do not recollect, but said it was all he would give till the morning."

Tenth. To the tenth interrogatory he saith: — " Black said he could have had the land sold for taxes, and obtained a title that way; I asked him why he had not done so; he said he was afraid other speculators would come in and trouble him, or get the land; I think he mentioned Norcross."

Eleventh. To the eleventh interrogatory he saith: — " I made the deed for Tyler and his wife to sign; when I commenced writing the deed, Black took from his pocket a memorandum, and dictated to me a description of the land, and caused me to use words different from those I should have used; he then, for the first time, gave the name of the county in which the land is situated, and the number of the township, which was different from the number he had before given, as I have before stated in my answer to the fourth interrogatory; and he directed me to put in a much larger sum for the consideration in the deed than he gave Tyler, which I did."

It appeared afterwards, in evidence, that the deed from Parsons to Putnam was on record in the office for registering deeds for land in Hancock county, kept in the town of Ellsworth; and it also appeared that Black had no lien upon the land for taxes paid by him.

In December, 1846, Edward Putnam wrote to Tyler giving an account of Black's visit to him and his ineffectual efforts to purchase his share of the land.

In June, 1847, Tyler and wife filed their bill against Black in the Circuit Court of the United States for the District of Maine. It set out their title; averred their entire ignorance of it until informed by Black; charged that he had deceived them by false representations as to their title, and as to the character, quantity, and value of the land; and also by setting up false pretensions to a lien upon it held by him on account of his having paid the taxes. The bill further charged that the land was heavily covered with timber, which could easily be carried to market, and was worth twenty thousand dollars; and that confiding in the fraudulent representations of Black, they had been induced to sell it for the grossly inadequate consideration of one hundred dollars.

In October, 1849, Black filed his answer. He admitted the title of the complainants, his interview with them; their allegation to him of their ignorance respecting their title; his agency for lands in the neighborhood; but he denied ever having been upon that particular lot, or that he had caused an exploration of it to be made, or that he had any particular knowledge of it; denied that he had ever claimed to have a title or lien for taxes paid; averred that in 1844, or 1845, he accidentally learned that Tilden, (whom he had supposed to be the owner of the whole lot and for whom he had been the agent,) was the owner of only an undivided part, and that thereupon he had examined the records of the registry of deeds for Hancock county, for the purpose of ascertaining in whom the title was vested, but could find nothing there relative to it. That he then examined a plan-book, and there found the name of Zenos Parsons, Springfield, set down against this lot as the owner of it; that in the summer of 1846 he was informed by Tilden that said Parsons conveyed to one Dr. Putnam, of Charlestown, a part of this lot.

Both the bill and answer contained other particulars, which it is not necessary to mention. Much evidence was taken under commissions.

At September term, 1849, the cause came up for hearing upon the bill, answer, pleadings, and evidence, when the Circuit Court dismissed the bill, and the complainants appealed to this court.

In the argument of the cause here it was insisted by the coun-

sel for the defendant that this court had not jurisdiction, as it did not appear in the evidence that the value of the land in controversy was enough to justify the appeal. We think otherwise; one of the witnesses gives an exaggerated estimate, and others not enough to enable us to say what the value of the land is; but the exploration, made at the instance of the complainants, satisfies us that the land for its timber alone, if it had no other uses, is worth more than two thousand dollars.

If we look too at its value at the time when Black bargained for it, we think it must be admitted that the sum which he offered and which the complainants accepted upon his representations, was an inadequate price.

But the ground upon which we shall put this case is, that the defendant did not act fairly in the representations made by him to the complainants of the quantity and quality of the land, and in his statement to them that he had a claim upon the land for taxes, which was not true. The quantity of the land is larger than he said it was, and from his agency for the owner of a part of it for many years, and his knowledge how the title was acquired, he must have known what the grant called for. In representing it to be less, he could only have done so to diminish, in the view of the complainants, its value. The untruth in regard to his claim for taxes, without any thing else, is sufficient for us to cancel the deed for a fraudulent misrepresentation.

Stanwood's testimony has been given in detail, because it corresponds with the averments in the bill, and is confirmed in all essential particulars by the admissions of the defendant in his answer, especially in two, which we think decisive of the decree which ought to be made in this case. Those are the defendant's repeated misrepresentations, made at different times and to different persons, and to these complainants when he was bargaining with them for the land, as to the quantity, and his misstatements concerning the taxes paid upon it by his father and himself for many years, especially used by him to the complainant as an inducement for him to sell the land for the small sum which he offered for it.

It cannot be doubted that the defendant knew, when he went to Fairfield to buy this land, where he learned that the wife of this complainant was a daughter of Aaron Putnam, that he knew the latter's interest in the Parsons grant exceeded five hundred acres; indeed, that he positively knew it could not be short of twelve hundred acres. He stated, however, to Stanwood, that it did not exceed five hundred; to Louisa Stanwood the same. When he went to Fairfield to buy the land, he said, in reply to Edward Putnam's inquiry as to the number of acres,

that he did not know any thing about the amount of the land, that he did not know the number of acres, and said there were four or five hundred acres. Soule, another witness, represents, that when questioned concerning the quantity, he answered that he did not know, that there was probably two or three hundred acres, and that the value was merely nominal. Phebe Hendrick says that Black said, that the number of acres might be two hundred and fifty, but could not exceed three hundred acres. Mrs. Soule says the same. These statements are so inconsistent with the narrative given by Black in his answer of his and his father's agency for many years, for. Tilden, who was the owner of a part of the Parsons grant, for which, as the agent of Tilden they had paid the taxes for more than twenty-seven years, that it must be concluded he concealed and misrepresented the quantity to the complainants to induce them to sell. He states that he had learned, as early as February, 1846, that Tilden's interest in the land did not exceed seven hundred and seven acres. That Tilden afterwards told him, that Parsons had conveyed to Putnam a part of the lot, but denies that he had, prior to November, 1846, when he went to have the deed of the complainants to him recorded, any knowledge that Aaron Putnam was the owner of one thousand two hundred acres of the Parsons lot or grant. Now this last may very well be so ; but whether he had that knowledge or not, he must have misrepresented as to the quantity of the land, when he so repeatedly undertook to speak of it as not being more than from three to five hundred acres. It is not the less a misrepresentation because he did not know how much Parsons had conveyed to Putnam. He undertook to speak of it as if he did, as an inducement to the complainant to sell to him, and in that way misled him to do so.

The defendant's answer in respect to the averment in the bill of his statement to them of the payment of taxes upon this land is evasive, and directly at variance with the proofs in the cause. He states that his father had been the agent for the owners of land in the township for more than thirty years, and that he had been his associate in such agencies since the year 1833, that it was a part of their agency to pay the taxes assessed on the land under their care; that the taxes on this township have, during all the time of their agency for Tilden, been paid by his father and himself as though the whole of said lottery lot had been the property of Tilden, and that he did not know until recently that Tilden did not own the whole of it. And in what he means to be a direct denial of the plaintiffs' bill in this particular, he denies that he ever claimed any title to the land by virtue of a tax-sale and deed therefor, or that he had any lien on the same for taxes paid by himself, but that he told them that he might have

allowed the land to be sold for taxes, and that we, meaning his father and himself, had paid the taxes and ought to be reimbursed in the sums so paid, with such interest as the law allowed in cases where land was sold for taxes, which he believed to be twenty-five per cent., and that Tyler replied that was right, and that whoever owned the land ought to pay them.

The proofs in the cause of the use which he made of this payment of taxes is, that he represented to the complainant when bargaining for the land that he had a claim upon the land for the taxes he had paid for twenty-eight or twenty-nine years; that Tyler must pay him the amount of the taxes and twenty-five per cent. interest before he could avail himself of any title to the land, and this he required in addition to the fifty dollars which he asked, for the information he had concerning the land, for which he would tell them all he knew about the land. This is a part of Stanwood's evidence. Louisa Stanwood testifies, that the defendant said, that Tyler would have to pay the taxes at any rate before he could do any thing with the land, and he could go home and have the land sold for taxes and get a good title, and Tyler would never be the wiser for it. To Putnam he said the taxes he had paid on the land were two hundred dollars or over; that he claimed a lien upon the land on account of it. Albert G. Soule says, that Black stated, having ascertained that Edward F. Putnam and his wife were heirs to a quantity of land in Maine, which came by their grandfather Dr. Putnam, that he had come to get a conveyance of it; "that he had paid the taxes on the land for twenty-seven years, and he wanted either that they should convey to him their interest or refund the amount which he had paid for taxes. Being asked what the amount was, he replied he did not know, but thought two hundred dollars. He was asked for his account; he answered he had it not with him. Another witness, Phebe Hendrick, says, that Black said he had paid the taxes for a long time, amounting to about two hundred dollars. Mrs. Soule repeats the same.

We have then, from these witnesses, a confirmation of what was said by Black to these complainants when he was bargaining with them for their share of this land. His object evidently was to induce them to take his small offer for the land in consideration of their obligation to repay him taxes, which there is no proof in the cause he ever paid.

In the two particulars stated, we think the entire proceedings of Black in this transaction were inconsistent with fair dealing, and that what was said by him both as respects the quantity of the land and the taxes he had paid upon it amount to a fraudulent misrepresentation, entitling the complainant to the relief of having the deed of conveyance to Black cancelled. We shall direct it to be done.

Campbell et al. v. Doe.

We shall direct the deed from the complainants to the defendant to be cancelled, and that the defendant reconvey to the complainants all the right, title, and interest acquired of him. from them in said land.   And we further direct that an account shall be taken in the court below of such profits as the defendant may have made from said land, and that he shall account for the same to the complainants, subject to a deduction therefrom of the sum of $100 paid by the defendant to the complainants as the consideration of their transfer to him of their interest in the land, if the said profits exceed the said $100, and if no profits have been made, then that the complainants repay to the defendant the aforesaid $100.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maine, and was argued by counsel.   On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby reversed with costs, and that this cause be, and the same is hereby remanded to the said Circuit Court, with directions for further proceedings to be had therein, in conformity to the opinion of this court.